Filed 7/15/26  In re K.P. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re K.P., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> KAYA P., <br><br> Defendant and Appellant. | D087353 <br><br> (Super. Ct. No. J521641) |

APPEAL from an order of the Superior Court of San Diego County, Daniela A. Reali-Ferrari, Judge.  Affirmed.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant.

Damon M. Brown, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Natasha Edwards, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

Kaya P. (Mother) left her three-year-old son, K.P., unclothed and alone inside a room on the second floor of a hotel, primarily occupied by illicit drug users.  The room contained a strong odor of marijuana, multiple hazards on the floor, such as tobacco and a razor, and the only food in the refrigerator was a box of soy milk and hot sauce.  In addition, K.P. knew how to open the front door unassisted and had access to a balcony that overlooked a street intersection.

The San Diego County Health and Human Services Agency (Agency) previously responded to a report that raised concerns about Mother's ability to adequately care for K.P.  When a social worker stopped by the hotel, he discovered K.P. alone and could not reach Mother.  The Agency filed a dependency petition alleging Mother failed to adequately supervise and protect K.P.  The juvenile court found the petition true, took jurisdiction, and removed K.P. from Mother's custody.

On appeal, Mother asserts we must reverse the juvenile court's jurisdictional order because substantial evidence does not support a finding that K.P. was at a substantial risk of serious physical harm under Welfare and Institutions Code[1] section 300, subdivision (b)(1).  She further asserts we must reverse the dispositional order because K.P.'s removal was largely based on a single incident of inadequate supervision.  Additionally, she contends the juvenile court erred in finding the Agency made reasonable efforts to prevent K.P.'s removal and that there were no reasonable alternatives.  Because there is substantial evidence in the record supporting

_____

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

2

the challenged findings and orders, we reject Mother's contentions and affirm.

## BACKGROUND

### I.

### *Circumstances Leading to the Dependency Petition*

On May 30, 2025, the Agency became concerned about Mother's ability to adequately care for K.P. because it received a report that law enforcement had brought Mother into the hospital on a section 5150 hold for being gravely disabled and a danger to herself. According to the reporting party, Mother stated she was " 'partying [and] doing drugs,' " including cocaine "every once in a while," and did not know the whereabouts of her son.

Earlier that morning, law enforcement received a report that Mother was hanging out of a window and yelling that her son was taken. It looked like she was going to jump. A police report described her as "extremely intoxicated," having "a strong odor of an alcoholic beverage emanating from her person," and "not wearing adequate clothing for the elements." She told law enforcement she was depressed and trying to jump out of the window. The officers determined she met the criteria for a section 5150 hold and transported her to the hospital.

Mother's medical records show that while she was hospitalized she reported suicidal ideation and denied alcohol intoxication and illicit drug use. But her urine drug screen revealed she was positive for cocaine and marijuana, and a breathalyzer showed her blood alcohol level was at 0.059 percent. She later told hospital staff she was at a party " 'doing drugs,' " including " 'some cocaine.' " She shared that she has a history of depression and recalled a time in college when she ran into traffic due to suicidal ideation and was hospitalized. She reported she is homeless and does not

3

work or have income. Her medical records also reflect that "her family is out of state and her only support person is [her boyfriend]."

During her hospital stay, the on-call social worker met with Mother to help figure out K.P.'s whereabouts because Mother said she last saw him two days ago and kept changing the name of the individual she believed was caring for him. Mother became agitated and aggressive and attempted to leave but was then restrained, medicated, and brought back to bed. When the social worker followed up later, Mother responded " 'oh he's fine, I was trippin' " and claimed K.P. was with her boyfriend. She said she needed to be discharged from the hospital to care for K.P. because her boyfriend needed to go to work. Before she was discharged, she was provided with resources for crisis housing, outpatient counseling, emergency homeless shelters, and substance abuse programs. She was also "strongly encouraged to avoid further cocaine use and decrease her alcohol consumption."

On June 2, 2025, the Agency's investigating social worker followed up with Mother and her boyfriend to learn about the family's circumstances and to ensure K.P.'s safety. Mother claimed she could not recall why she was in the hospital and said that K.P. was with her boyfriend the entire time. Mother denied using drugs when the social worker asked why she tested positive for cocaine and marijuana; instead, she claimed someone put something in her drink to drug her. She asserted she rarely drank alcohol and occasionally smoked marijuana and offered to do a hair follicle and urine drug test for the Agency. During the interview, Mother became angry, saying "fuck you, fuck cps," and went to the back room and slammed the door. After a while, she came back and decided to finish the interview.

Mother also told the social worker that she had no support from family or relatives in California. K.P. was not up to date on immunizations and did

4

not attend daycare. She denied leaving K.P. alone. She stated that K.P. sometimes stayed with her boyfriend when she had school Monday through Friday, 9:00 a.m. to 5:00 p.m. When the social worker interviewed the boyfriend, he shared that K.P. stayed with Mother most of the time and that K.P. was usually with him on the weekends. He also mentioned that Mother drinks with a school friend on Fridays.

The social worker created a safety plan with Mother and her boyfriend which precluded Mother from being alone with K.P. and required her boyfriend to supervise and take K.P. with him whenever he could not supervise Mother. The safety plan also included drug tests for Mother and random visits by the social worker. Mother and her boyfriend agreed to the safety plan.

On June 3, 2025, the social worker requested that Mother complete a urine and hair follicle drug test. Mother "delayed" drug testing and declined to complete a hair follicle test. The result of the urine test showed she was positive for marijuana.

Around 10:00 a.m. on June 13, 2025, the social worker visited the family to follow up on the safety plan. The hotel was located at an intersection, and the room was on the second floor, with a door opening to a balcony facing the street. When the social worker arrived, he knocked on the front door of the hotel room, and K.P. opened it. The child was alone and wearing only a diaper. There was a strong odor of marijuana coming from the room. After the social worker tried unsuccessfully to telephone Mother, he called the police.

When police officers arrived, they immediately noticed a strong odor of marijuana and that the room was in disarray. They confirmed no one was supervising K.P. and that the bathroom door was unsecured, allowing access

5

to the bathtub and toilet. Only a box of soy milk and hot sauce containers were inside the mini refrigerator. They observed multiple hazards within reach of K.P., including choking hazards, razors, tobacco products, oral rinse, and air freshener. They also determined K.P. was at a significant risk of injury or death due to a potential fall, as he was left unattended on the second floor.

K.P. was transported to Polinsky Children's Center while another officer reviewed the hotel surveillance footage. The footage showed Mother left the hotel around 8:00 a.m. and did not return until three hours later. When she returned, she was detained and arrested for child endangerment. Incident to her arrest, the officer searched Mother and found "a Ziploc bag containing marijuana" on her.

## II.

### *Dependency Petition and Detention*

On June 17, 2025, the Agency filed a petition alleging Mother failed to supervise or protect K.P. under section 300, subdivision (b). At the detention hearing, the juvenile court made a prima facie finding on the petition. The court determined there was a substantial danger to the physical health of K.P., and it was contrary to K.P.'s welfare to continue in Mother's care. As a result, the court detained K.P. in a resource family home and granted Mother liberal supervised visitation. The court made several findings: the reason for removal was general neglect; there were no reasonable means to protect K.P. without removal; and there were no known available services which could prevent the need for removal. The court also found "[r]easonable efforts have been made to prevent or eliminate the need for the removal of the child from the parent's home and to make it possible for the child to return home." The court also ordered that the Agency provide services for Mother.

# III.

## *Jurisdiction and Disposition*

The contested jurisdiction and disposition hearing was held in October 2025. Without objection, the juvenile court received into evidence the Agency's detention report, the jurisdiction and disposition report, and various addendum reports. Attached to the reports were Mother's medical records, drug test results, law enforcement reports, and other documents. Counsel for Mother elected not to cross-examine the social worker, and Mother testified on her own behalf.

### A.    *Additional Information from the Agency's Reports*

#### 1.    *K.P.'s Circumstances*

In June 2025, K.P. was initially placed in a resource home, but his behavior was too challenging for his caregivers. The Agency transitioned K.P. into a different placement. The new caregiver shared that K.P. uses foul language when he is upset. She was also concerned that K.P. had asked her, " 'Do you hear [Mother] screaming?' " She noted K.P.'s behavior was challenging, but he was responding well to redirection, and his language was slowly improving. Also in June, K.P. had a visit with Mother after she was released from custody. Five minutes into the visit, K.P. ran out of the room to the caregiver in the lobby and did not want to continue. Mother started crying, insisting she was not a bad mom.

During a visit in July 2025, the social worker observed K.P. energetically playing with toys. When she asked whether he missed Mother, he replied, "No." She also asked whether he feels safe with his caregivers, and he said, "Yes." Additionally, she asked how he felt about visits with Mother, but he did not answer and ran around the backyard. The social worker went inside and spoke with one of K.P.'s caregivers. The caregiver

7

shared K.P. is " 'very independent.' "  Later, the social worker noticed that K.P. had fallen asleep on the caregiver's chest.

During a visit in August 2025, K.P. "swatted" at Mother's arm and leg when she attempted to take her phone from him.  Mother said to K.P., "Snap out of it, I'm talking to you.  Do you want me to leave. . . stop this crybaby shit."  K.P. cried, and Mother responded with "What's your problem?" The visitation supervisor asked Mother to rephrase her language.  Soon after, Mother told K.P., "Knock it the fuck off."  At one point, Mother threatened to throw an object at K.P.  The visitation ended early because Mother violated visitation policy.

In September 2025, the caregiver shared at a Child and Family Team (CFT) meeting that K.P. is "very high energy, strong-willed" which made it "challenging" to keep him safe out in the community.  "He is supervised constantly" but runs off.

In October 2025, the Agency, at Mother's request, moved K.P. to a new placement with someone Mother considered an aunt.  K.P.'s therapist reported K.P. was adjusting to the new placement better than expected and there were no behavioral concerns.  Although Mother occasionally showed up late, the visitation supervisors said Mother's visits went very well.  K.P. also told the social worker he liked visiting Mother at the park.

2.  *Mother's Circumstances*

Following her arrest in June 2025, Mother was incarcerated for a few days at Las Colinas Detention and Reentry Facility.  At the hearing on Mother's criminal charges, the criminal court issued a criminal protective order, protecting K.P. from Mother and precluding her from having any contact with him, except for supervised visitation in accordance with juvenile court orders.

8

In July 2025, the social worker asked Mother to complete a surprise drug test right before their scheduled meeting. After Mother completed the test, the social worker and Mother met to discuss the petition and the circumstances surrounding it. Mother said the petition was untrue; she left the door locked before leaving; the razor was on the bathroom floor "because it fell;" "[h]e won't go fucking around with a razor;" the entire floor of the hotel smells like marijuana because "there is nothing but crack heads;" and she did not understand why the marijuana smell was noted in the petition.

Mother explained, " 'I believe that [K.P.] heard someone knocking on the door so he thought it was me, and he opened it. Normally I will go downstairs and get towels, etc.' " " 'I have left him to go get snacks.' " K.P. is "comfortable with being by himself." He is "independent" and "a fast learner." He was alone for "maybe 2 hours." She asserted she was "right down the street" and "[h]e had snacks, whenever he wants to eat he does and goes get food from the refrigerator."

During the interview, Mother informed the social worker that there is a warrant for her arrest in Texas for engaging in prostitution; she moved with K.P. from Texas to Los Angeles, where she met someone outside a liquor store and started a one-year relationship marred by domestic violence. She explained that K.P. " 'witnessed a lot' " and saw Mother " 'beat [and] get knocked out,' " and she fled with K.P. to San Diego in 2024. In the same year, Mother was charged with aggravated robbery for stealing from a department store and diagnosed with anxiety and post-traumatic stress disorder (PTSD). She explained she needed to go to court and take classes because she is on probation.

Mother told the social worker she became depressed and smoked marijuana more often when her great-grandmother, who raised her and was

9

a huge support to her, recently passed away. But she was not interested in therapy as it worsened her depression in the past. She denied any mental health challenges, stating, " 'I am just depressed sometimes.' " During college, Mother tried cocaine for the first time. She asserted that, now, she does not " 'do drugs like that' " but " 'might smoke some weed here and there but that's it.' " The result of the surprise drug test she completed right before making those statements to the social worker showed Mother was positive for cocaine.

In August 2025, the social worker called Mother multiple times to check on her progress in voluntary services. Mother admitted she had " 'been slacking' " and "already missed some classes." She promised to start taking parenting classes and said she would communicate with the substance use specialist for an assessment. The social worker repeatedly followed up regarding her substance use assessment. Each time, Mother reported she would go, but she did not. The results for two drug tests Mother completed between August and September were negative.

Mother did not complete an assessment for substance abuse treatment until October 2025. At intake, Mother said she did not have a problem and only used substances when she was stressed out. After the full assessment, she was denied substance abuse treatment because the information she provided led to the conclusion that she did not have a drug problem. At the next hearing on Mother's criminal charges, the trial court issued a criminal protective order, precluding contact with K.P., except that it authorized unsupervised visitation in accordance with the juvenile court.

### 3. *Concerns of Extended Family Members*

The maternal great-grandmother told the social worker she is a psychologist and was concerned, stating she believed K.P. "does not have a consistent environment."

The social worker also spoke with the maternal grandfather, who shared concerns that Mother leaves K.P. alone. He once received a video call from K.P. and could only see his face. K.P. seemed to be alone in a dark room. When the social worker asked if he had any concerns about physical abuse, he responded that he knows "[Mother's] mom was heavy handed" and "[Mother] thinks that's okay. I know there are times when she does do that." Additionally, he said " 'she screams at [K.P.].' "

### 4. *The Agency's Concerns*

The Agency recommended the juvenile court make a true finding on the petition, remove K.P. from Mother's custody, and order family reunification services with liberal supervised visitation for Mother. The Agency emphasized it was "worried for [K.P.'s] safety due to the ongoing issues for general neglect, substance abuse, and caregiver absence." It was highly concerned because, due to his young age, he relies completely on his caregiver for protection and Mother failed to provide protection. The Agency worried that if Mother continues to neglect his need for supervision and care, he could become severely harmed. The Agency was also concerned about K.P.'s emotional and developmental needs. It believed Mother needed to be a consistent, mentally present parent that could offer K.P. a stable environment and gain an understanding of how her actions have placed K.P. at risk. Further, she needed to demonstrate behavioral change and insight into the original protective issues and, for long term success, she needed to

participate in services and be honest and forthcoming with the Agency, her support network, and her service providers.

B.      *Mother's Testimony*

Mother testified, "I left him for an hour" to work at a job in La Mesa, between 15 and 20 minutes away. She regretted it because "I didn't know that all of this was going to happen." Mother explained she had cocaine in her system in May because "I believe that someone had made a laced blend. I do smoke marijuana from time to time, and I believe that they put that in the marijuana." Mother attested that she was honest during the substance use assessment and that the assessor said she did not need the program.

Mother denied she was a cocaine user, testifying that cocaine is not her "drug of choice" but that she used it "in the past maybe once or twice." Mother testified she last used cocaine "[a] long time ago," maybe in 2020 before she had K.P.

C.      *Juvenile Court's Findings and Orders*

Mother asked the juvenile court to dismiss the petition, arguing the Agency failed to meet its burden of proving that K.P. needed the protection of the court. The juvenile court sustained the petition and found the allegations true by a preponderance of the evidence. It found that there is a continued risk of harm to K.P., Mother's progress toward alleviating or mitigating the causes that necessitated placement had been "minimal," as Mother had only begun to address the protective issues. The court explained it relied on the evidence that Mother has just started the parenting classes, she tested positive for cocaine as recent as July and she self-reports a history of using cocaine in the past. Further, K.P. is three years old and Mother describes him as a "bad kid" who "need[s] a whooping." At this point, Mother interrupted the court's ruling and claimed, "He hit me." The court continued, finding that

12

Mother told the child to " 'knock it the F off' as well as to 'stop that crybaby shit.' " Additionally, the court relied on and considered the statements by "collaterals that were interviewed . . . including maternal grandfather[,] who expressed having concerns about the child in the Mother's care."

The court declared K.P. a juvenile court dependent and found by clear and convincing evidence that removal from Mother's custody was appropriate under section 361, subdivision (c), including that reasonable efforts were made to prevent or eliminate the need for removal of K.P. from Mother's custody and that there were no reasonable means by which K.P.'s physical health could be protected without removal. Finally, the court ordered the case plan be amended to include individual therapy, random drug testing, for the Agency to have discretion to refer the Mother to substance use treatment programs if necessary, and liberal supervised visitation.

## DISCUSSION

### I.

### *Substantial Evidence Supports the Jurisdictional Finding*

Mother asserts jurisdiction was improper because substantial evidence does not support the finding that K.P. was at a substantial risk of serious physical harm or illness at the time of the jurisdiction hearing. We disagree.

"Dependency jurisdiction may be assumed over a child and her parent under section 300 if the child has suffered or is at substantial risk of suffering serious physical harm or illness as a result of the parent's failure or inability to adequately supervise or protect the child." (*In re M.D.* (2023) 93 Cal.App.5th 836, 848–849 (*M.D.*); § 300, subd. (b)(1)(A).) "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012)

13

208 Cal.App.4th 837, 843.) "The focus of section 300 is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

"The relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the time of the jurisdictional hearing ' "subject the minor to the defined risk of harm." ' " (*In re L.B.* (2023) 88 Cal.App.5th 402, 411 (*L.B.*).) "However, the juvenile court may consider past events when determining whether a child presently needs its protection." (*M.D., supra*, 93 Cal.App.5th at p. 848.) "Although '[e]vidence of past conduct may be probative of current conditions,' past conduct standing alone does not establish a substantial risk of harm." (*Id.* at p. 849.) "Instead, there must be some reason to believe the acts may continue in the future." (*Ibid.*)

"A jurisdictional finding that the minor is a person described in section 300 must be made by at least a preponderance of the evidence. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248 (*Cynthia D.*).) 'We review the jurisdictional findings for substantial evidence. [Citation.] We consider the entire record, drawing all reasonable inferences in support of the juvenile court's findings and affirming the order even if other evidence supports a different finding. [Citation.] We do not consider the credibility of witnesses or reweigh the evidence.' (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137–138.)" (*L.B., supra*, 88 Cal.App.5th at pp. 411–412.) The parent has the burden on appeal of showing that there is no evidence of a sufficiently substantial nature to support the juvenile court's findings and orders. (*In re M.R.* (2017) 8 Cal.App.5th 101, 108 (*M.R.*).) We conclude Mother has failed to carry that burden.

The Agency alleged in the petition that Mother failed to adequately supervise or protect K.P., in that "[T]he child was left alone for at least 2 hours in a hotel room, on a second floor, with the door opened to the balcony

14

facing a street, and when the child was discovered, he was wearing only a diaper and there was a strong odor of marijuana coming from the room, and there is substantial risk the child will suffer serious physical harm or illness."

Substantial evidence in the record supports the juvenile court's finding that these allegations were true and that K.P. was a person described in section 300, subdivision (b). (See § 300, subd. (b)(1)(A) [the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm . . . as a result of . . . [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child"]; *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 724–725 [jurisdiction under subd. (b)(1) of § 300 requires substantial evidence of (1) a parent's failure to supervise or protect the child adequately, (2) causation, and (3) serious physical harm to the child, or the substantial risk of such harm].)

Law enforcement and Agency reports establish that Mother left K.P. alone in a room on the second floor of a hotel for approximately two to three hours. He opened the front door unassisted and had access to the balcony. Law enforcement found only a box of soy milk and hot sauce containers in the refrigerator. There were multiple hazards in the room, such as choking hazards, razors, oral rinse, and tobacco products. The bathroom door was also unsecured, allowing K.P. to access the bathtub and toilet. That evidence supports the inference that Mother left K.P. in a condition that posed a significant risk of serious injury to him due to potentially falling, choking, cutting, poisoning, or drowning.

While Mother contends this was an isolated incident, the evidence in the record supports a contrary finding; Mother made statements to the social worker such as K.P. is "comfortable with being by himself," " '[n]ormally, I will go downstairs to get towels,' " " 'I have left him to go get snacks,' " he is

15

" 'independent and he is a fast learner,' " and " 'whenever he wants to eat he does.' "  She also told the social worker that he gets "food from the refrigerator" and feeds himself.

Further, Mother's schedule leaves little time to supervise K.P.; she goes to school Monday through Friday, 9:00 a.m. to 5:00 p.m., works about 20 minutes away from the hotel, and goes out for drinks with her school friends on Friday nights.  She also did not have daycare, and her only support was her boyfriend, who also worked.  Additionally, the maternal grandfather told the social worker that he received a video call from K.P. alone in a dark room.

There is substantial evidence, when viewed as a whole, to support the court's finding that Mother left K.P. alone more than once.  Further, Mother's repeated desertion of K.P. provides "some reason to believe [her] acts may continue in the future." (*M.D., supra*, 93 Cal.App.5th at p. 849.)  Thus, a factfinder could reasonably conclude "there is a substantial risk that [K.P.] will suffer serious physical harm . . . as a result of . . .  [t]he failure or inability of [Mother]  . . . to adequately supervise or protect the child."  (See § 300, subd. (b)(1)(A).)  We thus conclude that substantial evidence supports the juvenile court's jurisdictional finding that K.P. was a person described in section 300, subdivision (b)(1)(A).

II.

*Substantial Evidence Supports the Dispositional Order*

Next, Mother challenges the dispositional order removing K.P. from her custody on the ground that it is not supported by substantial evidence.  She advances two arguments.  First, she contends that the order was not supported by substantial evidence because it was based primarily on a single incident of inadequate supervision.  Second, she argues the order was unjustified as the court erred in finding that the Agency made reasonable

16

efforts to prevent K.P.'s removal and that there were no reasonable means to avoid it. There is substantial evidence, considering the higher level of proof, to support the court's dispositional order that there would be a substantial risk to K.P.'s physical and emotional well-being if he were returned to Mother's custody.

Section 361 provides in pertinent part: "A dependent child shall not be taken from the physical custody of their parents . . . unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) " ' "A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. . . .' [Citation.] The court may consider a parent's past conduct as well as present circumstances." ' " (*In re Lana S.* (2012) 207 Cal.App.4th 94, 105.)

"We review a dispositional order removing a child from a parent for substantial evidence, ' "keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." ' [Citation.] '[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands.' [Citation.] In applying this standard of review, 'the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact

17

finder could have found it highly probable that the fact was true.' [Citation.] We view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*In re M.V.* (2022) 78 Cal.App.5th 944, 960.) "[T]he appellant bears the burden of showing ' "there is no evidence of a sufficiently substantial nature" ' to support the dispositional removal order." (*In re L.O.* (2021) 67 Cal.App.5th 227, 245.)

Turning to Mother's specific challenges to the juvenile court's order removing K.P. from Mother's custody, her first argument that the order was largely based upon a one-time incident of inadequate supervision does not persuade us that the order is not supported by substantial evidence. (See *In re J.S.* (2014) 228 Cal.App.4th 1483, 1492 [court must focus on averting harm to the child].) The same evidence that supports the juvenile court's jurisdictional finding—that Mother has repeatedly left K.P. alone in a dangerous condition—also supports the dispositional finding that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home." (§ 361, subd. (c)(1); see *In re K.B.* (2021) 59 Cal.App.5th 593, 600 (*K.B.*) ["Without supervision, nothing protects children from a world of serious and sudden danger."].)

Further still, the Agency's reports, showing that Mother had not registered for the recommended parenting course and had yet to demonstrate her parental judgment had improved, support an inference that a substantial risk to K.P. remained. Mother resists this conclusion by pointing to her testimony and statements that she is unlikely to leave K.P. alone again. Mother's arguments, however, misunderstand our role under the governing

18

standard of review. We do not reweigh the evidence but look only for substantial evidence supporting the court's findings and order. (See *In re I.J.* (2013) 56 Cal.4th 766, 773 [issues of fact and credibility are the province of the trial court].)

Additionally, the evidence in the Agency's reports showing that Mother has yet to acknowledge her substance abuse problem or that it impacts K.P. supports an inference that there is a high probability that K.P. is at risk in her custody. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."]; *K.B., supra,* 59 Cal.App.5th at pp. 604–605 ["A court is entitled to infer past conduct will continue where the parent denies there is a problem."], disapproved on another ground in *In re N.R.* (2023) 15 Cal.5th 520, 560, fn. 18; *In re D.B.* (2020) 48 Cal.App.5th 613, 622 ["Realizing conduct needs improvement is a first step to improvement."].)

Although Mother denies she has a "substance abuse problem," the Agency and law enforcement reports and Mother's medical records show that in May 2025 she used substances in excess, resulting in suicidal ideation, hospitalization, and a flawed recollection of K.P.'s whereabouts. Although she testified someone laced her marijuana with cocaine, her medical records reflect she told hospital staff, " 'I was at a party and did some cocaine.' " Further, Mother testified she had not used cocaine since 2020, but she tested positive for cocaine in May and July 2025. Mother's inconsistent explanations about the frequency and extent of her substance use supported a reasonable inference that she was still in denial and lacked insight into how her substance abuse problem could be detrimental to K.P.

The potential for detriment to K.P.'s physical and emotional well-being in Mother's custody while she has untreated mental health diagnoses, such

19

as anxiety and PTSD, is evident. In college, Mother tried running into traffic and was hospitalized on a section 5150 hold. She was prescribed medication that she never took. That incident and her hospitalization in May 2025 were both preceded by her feeling "depressed." And those feelings persisted. K.P. is affected by Mother's untreated mental health issues. Mother told the social worker that when K.P. sees her crying and feeling down, " 'it messes with him.' " At three years old, his physical and emotional well-being turns on whether he has a caretaker who is physically and mentally healthy. The foregoing facts support an inference that Mother's judgment and capacity to protect K.P. is compromised by her substance use and untreated mental health issues, placing K.P.'s physical and emotional well-being at risk in her custody.

The other evidence in the reports showing risk to K.P. includes Mother's attitude toward him. Mother told the social worker that K.P. " 'needs an ass whooping because he's a fucking bad kid.' " During a visit, Mother "threatened to throw an object at [K.P.]," told him, " 'Knock it the fuck off,' " " 'stop this crybaby shit,' " and when he cried she stated, " 'What's your problem?' " The Agency's report indicates the social worker explained to Mother that her reactions to K.P. "could be counterproductive to the child's well-being" and his behaviors are "trauma responses." When the court quoted Mother's statements in its ruling, Mother justified her behavior by blaming the child, claiming "he hit me." (See *M.R., supra*, 8 Cal.App.5th at p. 109 [A parent's minimization of conduct calls into question their general judgment].) The evidence of Mother's statements about and to K.P. supports an inference that Mother has an attitude toward K.P. that is detrimental to his emotional and developmental well-being.

20

Turning to Mother's second argument, we disagree with her contention that the removal order was unjustified as the Agency "failed to carry its burden of proof  to show that it made reasonable efforts to prevent or eliminate the need for removal."  "[T]he California Rules of Court require [the Agency] to submit a social study which 'must include' among other things:  'A discussion of the reasonable efforts made to prevent or eliminate removal.' (Cal. Rules of Court, rule 5.690(a)(1)(B)(i))" "[t]o aid the court in determining whether 'reasonable means' exist for protecting the children, short of removing them from their home."  (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809 (*Ashly F.*).)

Here, the Agency's reports included multiple discussions of the reasonable efforts it made to avoid removal.  The reports show that the social worker created a safety plan to avoid K.P.'s removal and that Mother violated it.  The Agency also provided her with resources for mental health services and other services, including parenting classes. But she was admittedly "slacking" and missed several parenting classes.  And the Agency referred her to a substance use specialist, but she did not receive treatment because she denied having a substance use problem.  These facts support the court's findings that the Agency made reasonable efforts to avoid removal but the risk of harm to K.P. remained due to the fact Mother only recently started

engaging in the services offered to her.[2]  That in turn supports the court's conclusion that there were no reasonable means to avoid K.P.'s removal.

We also disagree with Mother's contention that the juvenile court erred by not stating the factual basis for its findings.  Section 361, subdivision (e), requires that the court "state the facts on which the decision to remove the minor is based."  (§ 361, subd. (e); *Ashly F., supra*, 225 Cal.App.4th at p. 810.)  Here, the court explained that its findings supporting the removal decision were based in part on Mother's attitude toward K.P., failure to complete the parenting course, and recent positive drug test for cocaine.

As we have recounted, the record amply contains substantial evidence to support a high degree of probability that the agency made reasonable efforts to prevent removal, there would be a substantial risk posed to K.P.'s physical health and emotional well-being if he were returned to Mother's custody, and there are no reasonable means by which he can be protected without removal.

---

[2]     At a detention hearing, "[t]he court must make findings regarding whether reasonable efforts were made 'to prevent or eliminate the need for removal of the minor from his or her home.' "  (*Cynthia D., supra*, 5 Cal.4th at p. 248; see § 319, subd. (f)(1).)  Mother contends that the juvenile court did not make the reasonable efforts finding at the detention hearing.  But the reporter's transcript shows that the court did and that it referenced the social worker's report as the evidence it relied on.

DISPOSITION

The juvenile court's October 24, 2025 jurisdictional and dispositional orders are affirmed.


DO, J.

WE CONCUR:


McCONNELL, P. J.


RUBIN, J.